PROVIDENCE, SC.

SUPREME JUDICIAL COURT,
September Term, A. D. 1838.

*Present*—Hon. JOB DURFEE, *Chief Justice.*
  "    LEVI HAILE,
  "    WILLIAM R. STAPLES, } *Associates.*

*Indictment,* STATE *v.* ABNER PECKHAM.[1]

THIS was an indictment for a violation of the license laws of the State, found at the present term. The petit jury returned a special verdict, and upon that arose the questions raised at the Bar, and decided by the Court. That verdict was as follows:

"The Jurors impanelled to try said Indictment upon their oaths say:— That on or about the 20th of April, A. D. 1838, Victor Barcelow, a merchant, residing in the city, county and State of New York, imported from France,

---

(1.) For the Opinion of the Court in this case, it has hitherto been necessary to search the files of the newspapers of the year of its delivery. It is here inserted by request of members of the Bar who concur with the Reporter in regarding it as entitled to be thus brought to the notice of the profession, as well in view of its intrinsic merits, as of the facts, that the questions discussed and settled are yet agitated in some parts of our country, and that it shows the state of the law in Rhode-Island, under our charter government, prior to the adoption of our State Constitution.

upon the order of John J. Stimson and Almon D. Hodges, wine merchants, doing business in company in the name and style of Stimson & Hodges, in the city of Providence, a quantity of champaigne wine in baskets, called Napoleon wine, manufactured and put up by Messrs Jaqueson & Son, wine merchants, at Chalons sur Marne, in said France, the same being of the growth and manufacture of France. That the said wine was legally entered at the port of New York, by the said Barcelow, and the duties thereon secured and paid according to law by him. That on or about the 25th of April aforesaid the said wine was brought to Providence, and deposited in the warehouse of the said Stimson & Hodges. That on the 20th day of September, A. D. 1838, at said Providence, said Stimson & Hodges sold one unbroken basket of said wine, containing twelve bottles of one French quart each, in the same form in which the same was put up in France and imported as aforesaid, to the said Abner Peckham, the defendant, a wholesale grocer in said Providence. And that on the same day, viz: the 20th day of September, and at the same place, the said Abner Peckham sold said basket of champaigne wine unbroken, in the same form in which the same was put up in France and imported into this country, to Richard Smith, an innkeeper in said Providence, for use in his inn, it being the same champaigne wine mentioned in the third count of this indictment against said Peckham, and the same wine mentioned in the other counts thereof. And the jurors aforesaid further say that at the time of the last mentioned sale, the said Abner Peckham had no license from the Board of Aldermen of the city of Providence, as is required in the 6th section of the act of the State of Rhode-Island, passed at the January session of the General Assembly, A. D. 1838, entitled " An act to authorize the Town Councils in this State and the Board of Alderman of the city of Providence to grant licenses for retailing strong liquors, and for other purposes." And that on the 28th day of August, 1838, the freemen of the city of Providence, in conformity with the provisions of an act passed at the June session of the General Assembly of said State, A. D. 1838, entitled " An act in amendment of the act entitled an act to authorize the Town Councils in this State and the Board of Aldermen of the city of Providence to grant licenses for retailing strong liquors, and for other purposes," by their votes passed in legal ward meetings, instructed the Board of Aldermen of said city not to grant licenses for selling rum, wine, and strong liquors within said city during the year thereafter ensuing. And that licenses theretofore granted to grocers and others under the aforesaid first mentioned act, were, on the said 20th day of September, in force in said city of Providence, and continued in force until the 1st day of October, A. D. 1838, and that the defendant had not applied for a license. But whether upon the whole matter aforesaid by the jurors aforesaid in manner and form aforesaid found, the said Abner Peckham is by law punishable for selling said wine as aforesaid, the said jurors are wholly ignorant, and pray the advice of the Court upon the premises. And if upon the said matter it shall seem to the Court here that the said Peckham is by law punishable for selling said wine as aforesaid, then the said jurors upon their oath say, that the said Abner Peckham is guilty in manner and form as charged in the several counts

of said indictment. But if upon the matter aforesaid it shall seem to the said Court here that said Abner Peckham is not by law punishable for selling said wine as aforesaid, then the said jurors upon their oath say, that the said Abner Peckham is not guilty in manner and form as charged in the several counts of said indictment."

The law of January, 1838, here referred to, prohibited under a penalty of fifty dollars, all sales of wines, &c., in quantities less than ten gallons, save by persons licensed by Town Councils or Boards of Aldermen; and the supplemental act of June, 1838, was as follows:

"*Be it enacted by the General Assembly as follows:*—Section 1. Whenever the freemen of any town or city, shall, by their vote or votes passed in legal town meeting, or ward meetings, instruct the Town Council or Board of Aldermen of said town or city to grant licenses for selling rum, wine and strong liquors within said town or city, or shall instruct said Town Council or Board of Aldermen not to grant such licenses, the said Town Council or Board of Aldermen shall be bound to conform to such instructions: *Provided, however,* that any such Town Council or Board of Aldermen, shall not be so instructed at more than one town meeting in any one year, or at ward meetings in the city of Providence more than once in each year; and notice that the subject will be acted on, shall be contained in the warrant for calling said meetings."

*A. C. Greene, Attorney General,* and *George Rivers,* for the State.

*J. P. Knowles, Ames* and *Atwell,* for the defendant.

For the State, in the opening, it was contended, that in view of the special verdict, and of the acts of January and June referred to, the defendant was punishable for a violation of law.

For the defendant it was contended,—1. That the law is unconstitutional, so far as regards this case, inasmuch as the said statute, before the amendment of June, conflicts with the second paragraph of the 10th section of the 1st article of the Federal Constitution, which

provides that "no State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imposts laid by any State on imports or exports shall be for the use of the Treasury of the United States; and all such laws shall be subject to the revision and control of Congress:" citing the 8th section of the 1st article of the Constitution of the United States, which provides, that "Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States," and *Brown* v. *Maryland*, (12 Wheaton, 438:)—2. Because it contravenes that provision of the said 8th art. of the Constitution, which gives to Congress the exclusive power of regulating "commerce with foreign nations and among the several States and with the Indian Tribes:" citing 1 Story on Cons. 232, 239. 2 do. 471, 512. *Gibbons* v. *Ogden*, (9 Wheaton, 1.) 12 Wheaton, 446; 12 Peters, 78.—3. Because it is in violation of a commercial treaty with France, made July 4, 1831, to be in force ten years, and the statutes of Congress made in pursuance of that treaty: citing 8 U. S. laws, 696, 1000.

For the State, in reply, it was contended, that the law in question was in principle in harmony with all prior laws of the State, relating to the same matter, from 1728 to the present time; that under the Constitution of the United States and the decisions of the Supreme Court, no person other than the *importer* of liquor could claim exemption from a State law of this description, if, indeed, even he could; that a State has unlimited juris-

diction over all persons and things within its territorial limits, where it is not restrained by the Constitution of the United States; that those powers which relate to internal police are not thus restrained; and that this law is merely one of that class, which may properly be denominated police regulations, designed and suited to preserve and promote the public peace, health and morals: referring to and citing all prior license laws of this State; The Federalist, No. 45; a license act of Congress in 1813 (4 U. S. laws); 2 Peters, 251; 5 Wheaton, 1; 9 Wheaton, 194; 4 do. 316; The Federalist, No. 32; 4 Wheaton, 561, 563; and *Milln* v. *City of New York*, (11 Peters, 139, 142.)

DURFEE, C. J. The desire expressed by the counsel on both sides, for an immediate decision of this case, has obliged the Court to present the results to which it has come, rather than an extended opinion, on the question submitted to its consideration.

We are of opinion that the wine in question was sold in violation of a regulation of the city of Providence, prohibitory to a certain extent, adopted by force of a resolution of the freemen thereof, pursuant to the acts of January and June, 1838, relating to the licensing of the sale of wine and strong liquors. These acts are essentially prohibitory or restrictive. The power to grant licenses arises out of their prohibitory or restrictive character; and inasmuch as all regulations of trade are in some sense restraints upon it, this feature in those acts cannot be pronounced void, without at the same time its being in effect declared that every State regulation touching its internal trade is also void. Whether these acts be

or be not constitutional, must be determined by considering the authority in which they originated, and their object and effect.

It is undoubtedly the object of these acts, and the regulations adopted in pursuance of them, to aid the police in the several towns and of the city of Providence, in the preservation of good order, and in the prevention of pauperism.

The history of the license system from 1648 to the act of June last, no less than the examination of the acts themselves, and especially the acts under consideration, clearly show that such was their leading, and in the case before us, the exclusive object.

A power to pass laws, and adopt police regulations for the preservation of good order, and the prevention of vice and pauperism, is absolutely necessary to the existence of the State and of every well ordered community. Power to pass laws to this end belongs to the State exclusively. It belongs exclusively to the State by its Legislature to provide for the punishment of disorder within its limits, and also to the State exclusively to enact laws for its prevention. This power cannot be surrendered without self annihilation.

This power is one which may be exercised when necessary, (and the Legislature is the only judge of that necessity,) upon all objects that fall within the sphere of State legislation, and which are beyond the constitutional limits of the legislation of the general government. Within this sphere it may impose restraints and regulations on any pursuits, trades, or occupations—they being, in a strictly constitutional sense, the domestic or internal pursuits, trades, and occupations of the State.

Indictment, State *v.* Abner Peckham.

The constitutional provisions on which the counsel for the defendant rely, are those which forbid any State to impose duties upon imports, and which give to Congress the exclusive power to regulate commerce with foreign nations, and among the States. Do the restraints imposed under the authority of these acts, trench on these provisions? Do they assume to impose a duty on imports, or to regulate foreign commerce or commerce among the States?

They do not assume to impose a duty on imports, unless the term import, in its constitutional sense, means any article imported, wheresoever it may be found, up to the point of consumption. Such cannot be the meaning. The term import has a meaning of like universal application with the term export. Those terms do not signify the mere article itself, but the articles considered in connexion with a certain condition, as having certain destinations, inward or outward, and it is its particular destination which gives it its denomination. An import may become an export, and an export an import, on the same day, and in the same hands. Moreover:

An article of foreign commerce cannot be an import up to the point of consumption, in a constitutional sense; because if it be so, it must still continue subject, as at the moment of its introduction, to the exclusive commercial regulations of the general government, and may be followed by those regulations with all the officers necessary for enforcing them, and to the exclusion of State legislation, from hand to hand through all its transfers and divisions, up to its entire consumption. Again—if such be its meaning, then by parity of reasoning it may be shown that the same doctrine would apply to all articles of the growth and products of the several States,

which are or may be articles of commerce among the States—the power to regulate the commerce of the United States being a unit, and being as exclusively in the general government, in the one case as in the other. Upon this hypothesis, this overshadowing and engrossing power would come in contact with State legislation every-where, and everywhere triumphing as the supreme law of the land, leave little to the legislation of the State, except crime and pauperism, and small resources, indeed, to sustain it in its action over these. No court has yet given this interpretation to the constitution, and certainly, as the supreme judicial power of the State, it is not felt to be the particular duty of this tribunal to be the first to adopt such suicidal construction.

An import then ceases, in the constitutional sense, to be an import, the moment the importer becomes the vend-er, and sells the article disengaged from the commercial regulations of the United States. In the hands of the re-tailer or distributor, it is an article of the internal trade and commerce of the State—a trade or commerce which none but State legislation can protect or regulate, and which necessarily falls peculiarly under the police of every community. Any tax or restraint, therefore, im-posed for police purposes, upon the seller of wines and strong liquors within the State, can by no construction be deemed a duty upon imports, or a regulation of the commerce of the United States, unless a tax upon a ware-house be a duty upon imports, and a license to a dray-man a regulation of the commerce of the Union. We cannot, therefore, consider these acts as a contravention of either of the articles of the constitution upon which the defendant's counsel rely.

But as to the French treaty. Without stopping to in-

quire whether it be or be not constitutional, we may safely conclude, that although the government of the United States binds itself to admit the wines of France, at a stipulated duty, to be imported for consumption, yet it cannot be admitted that either of the contracting parties supposed that the United States were bound to provide for the consumption of all the wine that should be so imported, or that the several States were bound so to modify their police regulations as to admit it to consumption without restraint or regulation. Such could not have been the intention or expectation of either party.

We are therefore of opinion that the aforesaid acts are not inconsistent with the constitution of the United States, or any of the provisions thereof, or with any treaty made by authority of the same; but that (without meaning to intimate any opinion as to their expediency or inexpediency) the said acts are constitutional, and the binding law of the land.

Judgment must therefore be for the State.